## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:23-cr-00160-RC-1** |
| | ) | |
| **DANIEL BALL,** | ) | |
| | ) | |
| *Defendant.* | ) | |

### DEFENDANT BALL'S MOTION TO TRANSFER VENUE[1]

Daniel Ball, by and through undersigned counsel, respectfully requests that the Court transfer the above-listed case, preferably to his home district, the Middle District of Florida, pursuant to Federal Rule of Criminal Procedure 21(a)-(b).[2]

### ARGUMENT

The Fifth and Sixth Amendments to the U.S. Constitution secure a defendant's right to trial by an impartial jury. *See* Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to due process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the

---

[1] Undersigned counsel has other pretrial motions (e.g., a motion to suppress, a motion to dismiss) that she intends to file. However, as she expressed in her Motion to Extend the Pretrial Motions Deadline and Continue Pretrial and Expert Motions Hearings, *see* ECF No. 24, and in a prior similar filing, *see* ECF No. 22 (where undersigned counsel accommodated the government by consenting to its proposed earlier pretrial filing deadline, April 19, 2024, while notifying the Court that she still might need more time to file her pretrial motions), there have been some obstacles hindering her efforts to review and obtain discovery, among other hurdles. While the Court has not yet granted her most recent motion, *see* ECF No. 24, undersigned counsel files this Motion to Transfer Venue today to illustrate her good faith effort and diligence.

[2] At present, the government and the defense are exploring the prospect of proceeding in this case via a stipulated bench trial. Undersigned counsel believes there is a possibility that, should the government and the defense not reach agreeable terms for the stipulated bench trial, Mr. Ball might proceed by way of bench trial. However, he files this timely Motion to preserve this issue should he proceed with a jury trial.

proceedings upon the defendant's motion. *See* Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.[3]

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). To determine if the presumption of prejudice should attach, a court must consider three factors: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage. *See Skilling*, 561 U.S. at 378. However, in some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City would be constitutionally unfair); *see also United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006) (suggesting that had the defendant, who was charged with perjury, actually participated in the 9-11 attacks on New York, "the effects that a massive, disastrous event has wrought on the jury pool" would require a change of venue).

Where a presumption of prejudice attaches, the presumption overrides any juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights. *See Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of

---

[3] Federal Rule of Criminal Procedure 21(b) provides another avenue, where transfer of a case or specific charges is discretionary and a court considers factors such as convenience for the parties, alleged victims, and the witnesses and in the interest of justice. Rule 21(b) provides appropriate relief in this case, as the physical discovery for this case is located in Florida and the Middle District of Florida is where, or at least close to where, at least ten of the potential witnesses are located, including the government's explosives expert, from what undersigned counsel can gather. Further, as discussed below, the interests of justice also favor transfer of this case to the Middle District of Florida.

impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *See Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, *voir dire* is not a cure for significant and substantiated due process concerns about the jury pool.

Much like the effect on the community which led to a transfer of venue in the Oklahoma Bombing case, the "emotional burden of [January 6] and its consequences" and the community prejudice against defendants is so great that Mr. Ball cannot not obtain a fair and impartial trial in the District of Columbia and surrounding area ("the D.M.V.").[4] *McVeigh*, 918 F. Supp. at 1470. In the days leading up to January 6, at least one residential building in the District of Columbia was subject to a bomb threat.[5] The same building and many others had to barricade entrances.[6] Moreover, on January 6, there was at least one other nearby residential building where the residents and/or staff had to actively prevent individuals from entering.[7]

---

[4] Of note, the District of Columbia is uniquely positioned in that it is huddled closely with neighboring jurisdictions to where one community is formed; many people live in D.C. but work in Maryland or Virginia, or vice versa.
[5] Undersigned counsel obtained this information from speaking with staff who worked in the residential building along Pennsylvania Avenue in Washington, D.C.
[6] Undersigned counsel obtained this information from her observations and from speaking with staff who worked in the aforementioned residential building.
[7] Undersigned counsel obtained this information from speaking with residents who lived in the respective residential building along Pennsylvania Avenue in Washington, D.C.

Further, as a result of January 6 and the fear it cemented in the D.C. community, the residents of the District of Columbia also were prejudiced by a curfew, the closure of their streets and public spaces such as the National Mall, and a continuous National Guard presence. Indeed, while D.C. residents were still processing the events of January 6, streets and public spaces in the District of Columbia were blocked off for the inauguration, which further perpetuated the lingering fear held by D.C. residents.

To put things simply, living with the uncertainty and shock in the aftermath of January 6 was a cultural moment for D.C. residents.[8] To this point, Vice President Harris even commented, "Certain dates echo throughout history, including dates that instantly remind all who have lived through them – where they were and what they were doing when our democracy came under assault. Dates that occupy not only a place on our calendars, but a place in our collective memory[:] December 7th, 1941, September 11th, 2001, and January 6th, 2021." Vice President Kamala Harris, Remarks on January 6 Anniversary (Jan. 6, 2022), https://www.cnn.com/2022/01/06/politics/transcript-kamala-harris-january-6-anniversary-speech/index.html.

Additionally, the persistent and inflammatory media coverage surrounding January 6 has disadvantaged defendants currently facing trial. There is still consistent and regular coverage that highlights defendants in a negative way; it is fair to say that this type of coverage will likely only increase as the 2024 presidential election ramps up over the summer and fall and reaches its peak

---

[8] *See also* Dahval Dave, et al., "Political violence, risk aversion, and population health: Evidence from the US Capitol riot," J POPUL ECON. (July 14, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9281268/ ("Turning to stay-at-home behavior, we detect some evidence of risk avoidance in response to the Capitol Riot, as local residents increased full-time stay-at-home behavior and percent of time spent at home in the period surrounding and following the Riot. This finding is consistent with violence- or health-related risk-averting behavior. Moreover, some of the increase in stay-at-home behavior appeared to continue beyond the days surrounding the protest, consistent with 'lockdown conditions' in many quarters of the District in the period leading up to the inauguration of President Biden.").

at a time that more or less coincides with Mr. Ball's trial. In fact, former President Donald Trump has placed January 6 at the center of his presidential campaign, and the same seems to be true about President Joe Biden. *See* Aaron Navarro and Hunter Woodall, "The Biden campaign is trying to keep Jan[uary] 6 top of mind with voters. Will it work?," CBS (April 16, 2024), https://www.cbsnews.com/news/biden-campaign-trump-jan-6-voters/ [hereafter Navarro & Woodall, "The Biden campaign is trying to keep Jan[uary] 6 top of mind with voters. Will it work?"]; Steve Contorno, et al., "Why does Biden keep mentioning January 6? Because Trump won't stop talking about it," CNN (Mar. 16, 2024), https://www.cnn.com/2024/03/16/politics/biden-trump-january-6/index.html ("On this, Trump and President Joe Biden agree: January 6 itself is a central issue of the 2024 campaign and will be even if Trump's trials on related indictments get delayed past Election Day."); *see also* Lisa Mascaro, et al., "Trump is making the Jan. 6 attack a cornerstone of his bid for the White House," AP NEWS (Mar. 19, 2024), https://apnews.com/article/donald-trump-jan-6-pardons-2024-campaign-2401ead35cb1402a7b289c2c99761373. Indeed, this month, the Biden campaign held a press conference with two police officers who were at the Capitol during the events of January 6. *See* Navarro & Woodall, "The Biden campaign is trying to keep Jan[uary] 6 top of mind with voters. Will it work?"

The U.S. presidential election has the largest stage of any political event in the United States, and that stage is all the more amplified in our country's capital—the heart of our democracy—and surrounding areas.

And, given the charges against him, Mr. Ball, who is the first person charged with 18 U.S.C. § 844(h) in the District of Columbia in approximately twenty years, is arguably one of the most high-profile January 6 defendants presently facing trial. Although charged less than one year

5

ago, Mr. Ball's case has been discussed in detail on various major national[9] media outlets, to include U.S. News,[10] CNN,[11] NBC News,[12] AP News,[13] and UPI,[14] some stories even including images from Body Worn Camera, discussing the officer's alleged injuries (which is at issue in this case), and referring to the device at issue as an "explosive" (which is also at issue in this case). The media's coverage of Mr. Ball's case relies on and therefore reinforces the government's narrative, *see id.*, and highlights the bias that continues to permeate the D.M.V., *see* "Trump Honors Violent, Law Enforcement-Assaulting Rioters," BLUE VIRGINIA (April 4, 2024), https://bluevirginia.us/2024/04/trump-honors-violent-law-enforcement-assaulting-rioters (article with supposedly paid content from the Biden-Harris 2024 campaign that includes a comment from the campaign's spokesperson, James Singer, stating that former President Donald Trump "embraces political violence and honors those who assaulted law enforcement and attempted to overturn our democracy on January 6" and specifically references Mr. Ball and his case in relation to January 6).[15]

The pretrial publicity surrounding January 6 cases has been and will continue to be so pervasive and inflammatory that it "permeat[es] the trial setting . . . [such] that [Mr. Ball] cannot

---

[9] Of note, while pretrial publicity was prevalent in Florida, it appears that the only recent publicity in Mr. Ball's case is at the national level.

[10] *See* "Florida Man Charged With Throwing Explosive at Capitol Riot," U.S. NEWS (May 2, 2023), https://www.usnews.com/news/us/articles/2023-05-02/florida-man-charged-with-throwing-explosive-at-capitol-riot.

[11] *See* Andrea Cambron & Holmes Lybrand, "Florida man charged with throwing explosive at Capitol riot," CNN (May 3, 2023), https://www.cnn.com/2023/05/03/politics/florida-man-charged-explosion-capitol-riot/index.html.

[12] *See* Ryan J. Reilly, "Meet some of the violent Jan. 6 rioters Donald Trump keeps calling 'hostages,'" (April 4, 2024), https://www.nbcnews.com/politics/justice-department/trump-republicans-jan-6-hostages-violence-capitol-police-rcna143888.

[13] *See* "Florida man charged with throwing explosive at Capitol riot," AP NEWS (May 2, 2023) https://apnews.com/article/capitol-insurrection-florida-arrest-106785e4acbf246796476ffadb640116.

[14] *See* Darryl Coote, "Florida man charged with throwing explosive at police during Jan. 6 attack," UPI (May 3, 2023), https://www.upi.com/Top_News/US/2023/05/03/Florida-man-charged-Jan6-attack/3521683093327/.

[15] The Biden-Harris 2024 statement can be found at James Singer, Twitter Post (April 4, 2024), https://twitter.com/Jemsinger/status/1775958542517780637 (picturing the full Biden-Harris 2024 statement, with an accompanying Twitter caption that reads, in part, "Donald Trump embraces political violence and honors those who assaulted law enforcement and attempted to overturn our democracy on January 6.").

possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is particularly true in light of the fact that the individuals consuming the negative publicity are much more likely to be already predisposed to being adverse to former President Trump,[16] who is inextricably intertwined with the January 6 narrative.

---

[16] The District of Columbia tends to be significantly Democrat-leaning. *See* "District of Columbia, 270 TO WIN, https://www.270towin.com/states/District_of_Columbia#:~:text=The%20vote%20here%20has%20always,one%20v ote%20for%20Donald%20Trump ("The vote here has always been heavily Democratic; no Republican has ever won an electoral vote. In the 2020 election, Joe Biden received about 17 votes for each one vote for Donald Trump."). In fact, ninety-three percent of D.C. voters voted against Trump in the 2020 election, rendering it the least diverse political population in the country. *See* "Election Results: The 2020 presidential race," POLITICO.COM (2021), https://www.politico.com/2020-election/results/president.

Different materials presented in at least a few other January 6 cases from 2022 provide further empirical evidence that a D.C. jury will not be able to afford Mr. Ball a fair trial. *See United States v. Thomas Caldwell, et al.*, No. 1:21-cr-00028-APM (D.D.C.), ECF Nos. 654-1 and 654-3 (surveys of potential D.C. voters' opinions of January 6); *id.*, ECF No. 662-1 (analysis of *voir dire* in the first two January 6 trials); *see also id.*, ECF No. 654-2 (jury pool analysis of the District of Columbia); *United States v. Gabriel Garcia*, No. 1:21-cr-00129-ABJ (D.D.C.), ECF No. 54-1 (survey of potential voters' opinions of January 6); *see also* Exhibit A. A more recent jury pool analysis conveys the same concern. *See* Exhibit B. Though, undersigned counsel suspects that the findings would be all the more egregious in the coming months once the various criminal cases against former President Trump, particularly those pertaining to election interference, and the presidential election campaigns pick up.

## CONCLUSION

In light of the above, Mr. Ball requests that this Court transfer his case to the U.S. District Court for the Middle District of Florida.

Respectfully submitted,

_____/s/_____
Amy C. Collins
D.C. Bar No. 1708316
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(228) 424-0609
amy@amyccollinslaw.com
acollins@kalbianhagerty.com
*Counsel for Daniel Ball*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that, on this 19th day of April 2024, I have served this Motion upon all parties in this matter through the CM/ECF system.


_____/s/_____
Amy C. Collins