UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 23-cr-160 RC |
| | : | |
| DANIEL BALL, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION FOR CHANGE OF VENUE

The United States of America respectfully opposes Defendant Ball's motion for a change of venue. The defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain

whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

I.   **Prejudice based on media attention.**

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local

2

television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston,

where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

      a.  **Size and characteristics of the community**

Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont); a larger population than each of the Article IV courts in Guam, Northern Mariana Islands, and the U.S. Virgin Islands; and more than four times as many people as the parish in *Rideau*.

The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of more than half a million, "12 impartial individuals could not be empaneled." *Id.*

4

### b. Nature of the pretrial publicity

This case does not involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Instead, Mr. Ball notes national media outlines that have continued to mention his name. But these outlets are not limited to the District of Columbia. Instead, these same outlets are just as available within the Middle District of Florida as here, but the District of Columbia does not have the same local reporting, which is noted by Mr. Ball in the Middle District of Florida as "prevalent." ECF No. 25 p. 6, n. 9.

In *Rideau*, "What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." *Rideau*, 373 U.S. at 725. In the present case, the coverage is not comparable.

Mr. Ball's case, at least the recent reporting of it, has been reported alongside other individuals who are detained pretrial to provide context to the number of "January 6 hostages." Within the reporting provided by Mr. Ball, he is identified as one of fifteen pretrial detainees.



*Figure 1: Screenshot from MSNBC Reporting on Mr. Ball's pretrial status.*

But the recent reporting does not depict, or at least discuss, the facts to be proved at trial.

In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Haldeman*, 559 F.2d at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants. Further still, 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n. 2. (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue." *Id.* at 63-64.

Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 1,000 people. National reporting of the event is just as prevalent throughout the entire country, not just here in D.C. The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

   c. **Passage of time before trial**

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, nearly 40 months have already elapsed since the events of January 6, and trial is scheduled to occur at the end of September—five months after the most recent reporting provided by Mr. Ball. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724.

Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, much of the reporting has been national is scope, rather than limited to Washington, D.C., and none, to our knowledge, has focused on the defendant since April 2024. Even the smattering of mentions Mr. Ball's case has garnered do not relate to the facts to be proved at trial. Instead, it is on whether he has received due process. He has.

### d. The jury verdict

Because the defendant has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors support Mr. Ball's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## II. The impact of January 6 on Washington D.C. does not support a change of venue.

The defendant contends that the community was affected much in the same way as the community effect following the Oklahoma City bombing. ECF No. 25, p. 3. As noted in *United States v. McVeigh*, 918 F.Supp.1467 (W.D.Okla. 1996), "The measurable effects of that event include the deaths of 168 identified men, women and children, injuries to hundreds of other people, the complete destruction of the Alfred P. Murrah Federal Office Building and collateral damage to other building, including the United States Courthouse." 918 F.Supp. at 1469. That "tragic sense [was] heightened by the deaths of infants and very young children in the day care center. The

horror of that fact has been powerfully portrayed by the symbols of teddy bears and angels displayed everywhere in Oklahoma." *Id*. at 1472. This level of destruction was also attributable to a single case involving two defendants.

Courts have routinely concluded that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id*. But the defendant's argument is premised on current potential jurors having experienced the same level of tragedy as residents of Oklahoma City less than one year after the bombing.

Instead, January 6, 2021, is now more than three years in the past. Many D.C. residents do not live or work near the Capitol where the roads were closed, and the National Guard was deployed. There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here 40 months after the offense. Quite plainly, the name Daniel Ball does not garner the same level of prejudice as the name Timothy McVeigh.

**III.     Convenience of the parties**

Although Mr. Ball cites to Fed. R. Crim. Pro. 21(b) (Transfer "For Convenience"), he makes no attempt to argue it would be more convenient if trial occurred within the Middle District of Florida.

A change of venue would unquestionably be inconvenient for the government and its witnesses, the majority of whom are in or near this district. Mr. Ball's attorney, the government's attorneys, and the government's witnesses (with exception to the case agent), would all be *inconvenienced* by the transfer. Finally, Mr. Ball has pointed to no other instance in which this or any other Court has ordered a change of venue for convenience based on that consideration alone.

**IV.     Voir dire can ensure a fair trial**

Even the trials for cases that have garnered more press exposure than Mr. Ball's case stemming from January 6, 2021, including those charging complex conspiracies including seditious conspiracy, the rigors of voir dire have ensured fair trials. The government is not aware of a similar motion being granted in any other January 6 case based on Mr. Ball's arguments.

Despite Mr. Ball's contention that the potential political rhetoric will only increase as the trial date draws near, voir dire can still ensure a fair trial. The candidates' attempts to gain the attention of potential voters does not mean that potential voters' attentions will be obtained. Especially considering that it is more likely the number of topics discussed will increase as the election draws near, not necessarily the volume related to January 6 specifically. This Court should not presume prejudice for the publicity that has already happened; and this Court should not presume prejudice for the publicity that has not yet already happened.

**V.     Conclusion**

The United States respectfully requests this Court deny Mr. Ball's motion for a change of venue.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

Date: May 1, 2024                    /s/ *Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
MI Bar No. P79246
601 D. St. N.W.
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov

MICHAEL L. JONES
Trial Attorney
D.C. Bar No. 1047027
Trial Attorney
(202) 252-7820
michael.jones@usdoj.gov