## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:23-cr-00160-RC-1** |
| | ) | |
| **DANIEL BALL,** | ) | |
| *Defendant.* | ) | |

### DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF RANDY REYMAN AND JOHN STEINBERG

Daniel Ball, by and through undersigned counsel, respectfully files this Opposition to the government's Motion to Exclude Proposed Expert Testimony of Randy Reyman and John Steinberg.

### DISCUSSION[1, 2]

In its Motion, the government seeks to (1) exclude the expert testimony of Randy Reyman on the basis that it is "[un]reliable" and that Mr. Reyman is not qualified to testify about "possible injuries,"[3] and (2) exclude certain expert testimony of John Steinberg on the basis that it is "not relevant or does not assist the trier of fact." ECF No. 61 at 1, 7. The government's arguments are

---

[1] As a preliminary matter, the government misunderstood some of the defense expert's conclusions. For instance, Dr. Steinberg did not conclude that officers were injured by the device at issue. ECF No. 68-1 and 68-4 aims to resolve misunderstandings as it relates to the proffered testimony of Dr. Steinburg. We, accordingly, incorporate ECF No. 68 and its attachments by reference. (We also incorporate by reference the forthcoming supplement to ECF No. 68, which will serve to supplement the instant Opposition as well, even though the government has not contested the underlying facts and data considered by the defense's experts.) While we do not agree with the government's specific articulation of the expert opinions in ECF No. 61, we only address the opinions the government contested in its motion.

[2] We acknowledge there is overlap among the sections since the sections inform each other; accordingly, we incorporate each section throughout this filing by reference as applicable, even among the sections on the two different experts.

[3] The government mentions the issue of qualification on page 7 of its filing. It is unclear if the government is using this term colloquially or as used for technical purposes. We address the issue of qualification for purposes of Federal Rule of Evidence 702 in the event the government is such an argument.

meritless, and the Court should use its broad discretion to admit expert testimony and deny the government's requests.

## I.    RANDY REYMAN

### A.    Overview of Expertise[4]

Mr. Reyman is an expert that Mr. Ball's defense team retained after he received a number of referrals by former members of law enforcement who have worked with Mr. Reyman in some capacity. As the expert disclosure provides, Mr. Reyman is an expert in pyrotechnics, explosives, and fireworks, a civilian bomb technician, and an instructor, who has used his expertise in various ways, including to help construct explosive devices for law enforcement participating in training, to provide expert services in the field of fireworks, pyrotechnics, and explosives, and to provide training to law enforcement personnel in the field of fireworks, pyrotechnics, and explosives. *See* ECF Nos. 68 through 68-4. The law enforcement agencies Mr. Reyman has worked with in his expert capacity include the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, and Firearms and Explosives ("ATF" or "BATFE"), and the Arizona Department of Public Safety ("DPS"). *See id.*

Mr. Reyman has a license to manufacture explosives,[5] which he has maintained since 1988, and a pyrotechnics permit. *See id.* Mr. Reyman is also a member of the International Association of Bomb Technicians and Investigators ("IABTI"), which has the mission of "countering and defeating the growing menace that bombs and weapons of mass destruction present" and is considered "the world leader in the dissemination of information and training on destructive devices to the international public safety community." About Us, IABTI,

---

[4] The complete extent of Mr. Reyman's expertise (e.g., trainings, courses) is not set forth in his report materials.

[5] A license to manufacture explosives is "required by persons engaged in the business of manufacturing explosive materials for sale, distribution, or for their own business use." When is a manufacturer's license required?, ATF, https://www.atf.gov/explosives/qa/when-manufacturer's-license-required.

https://www.iabti.org/about/. IABTI provides members with state-of-the-art training and coveted access to materials such as *The EOD Equipment Buyer's Guide* and *The Detonator*. *See* "Membership Benefits," IABTI, https://www.iabti.org/membership-benefits/.

Since 1998, Mr. Reyman has taught and developed courses and provided training to law enforcement personnel on topics in explosives, pyrotechnics, and fireworks. *See* ECF Nos. 68 through 68-4. One course that Mr. Reyman has taught and developed is a 21-hour course called the Fireworks and Pyrotechnics Operations Level Course; this course operates as a bomb technician course for law enforcement personnel to earn credit for the Arizona Peace Officer Standards and Training ("POST") Board's officer training program. *See id*. As an approved POST course, Mr. Reyman's aforementioned course is one that law enforcement bomb technicians can take to fulfill their educational requirements to become or remain a bomb technician. *See id*.

Another course which Mr. Reyman has developed and taught is an 8-hour course called Pyrotechnics. *See id*. Through this course, Mr. Reyman instructed the Department of Public Safety's Explosive Ordnance Disposal Unit about the handling of display fireworks; he received official recognition for providing outstanding training. *See id*.

Mr. Reyman has also provided trainings to entities such as the IABTI. *See, e.g.*, Training Schedule, IABTI, http://www.iabti.org/uploads/itc/2018TrainingScheduleB.pdf.

In addition to developing courses and provided training, Mr. Reyman utilizes his manufacturing license to construct devices for law enforcement participating in trainings, including the trainings for which he is the instructor. *See* ECF Nos. 68 through 68-4.

Mr. Reyman also further participated in and continues to participate in formal education and training opportunities in his fields of expertise.[6] *See id*. For instance, through the ATF and

---

[6] The government mistakenly submitted that Mr. Reyman's educational background is limited to "a high-school diploma, attending a college level creative writing course, and two subject-matter-related courses in the field of

3

other law enforcement agencies, Mr. Reyman has received training on Arizona and federal law relating to explosives, pyrotechnics, and fireworks. *See id*. As another example, Mr. Reyman participated in a 24-hour course called Chemistry of Energetic Materials Emergency Response to Improvised Explosives and Clandestine Explosives Manufacturing. *See id*.

As far as assisting in a specific investigation more formally, Mr. Reyman has helped law enforcement with at least five cases. *See id*. For instance, he was sought out to assist the ATF and the Tactical Support Bureau's Emergency Planning Unit/Bomb Squad in a complex investigation where he performed an assessment. *See id*. The assessment involved him checking the operative location for hazardous materials (e.g., arsenic, phosphorous) and explosives and creating a plan for their safe removal and destruction. *See id*. He has received accolades for his expertise, including a certificate of appreciation for his crucial contribution in the aforementioned case and a certificate of appreciation from the Southern Arizona Arson and Explosives Group for his work in the field of pyrotechnics. *See id*.

In addition to all of Mr. Reyman's work with law enforcement (including providing training) and involvement in trainings and other educational activities, Mr. Reyman's owns and operates a company that creates commercial fireworks displays (including the respective display fireworks). *See id*. Mr. Reyman's technical expertise in the chemistry and effects of fireworks and other devices led him to create a new device, for which he sought a patent, *see id*.

**B.    Addressing the Government's Contentions**

In articulating its understanding of the expert disclosure as to Mr. Reyman, the government submitted that Mr. Reyman's expertise is limited to the "manufacture of pyrotechnics and

---

explosives manufacturing." ECF No. 61 at 6. For instance, Mr. Reyman completed a number of rigorous trainings and/or courses to inform his practice as a bomb technician. The expert report and resume for Mr. Reyman simply provide a summary of his experience, trainings, and coursework. Thus, among other things, Mr. Reyman has also engaged in various explosives breaching courses through a program recommended by law enforcement.

explosives" and that his proffered testimony is limited to "potential injuries inflicted and not to the characteristics of the device thrown." ECF No. 61 at 5. From its understanding, the government claimed that Mr. Reyman is not qualified to testify about possible injuries, *see* ECF No. 61 at 7, and that Mr. Reyman's proffered testimony is "[un]reliable," *id.* at 1. The government asks the Court to exclude the entirety of Mr. Reyman's proffered testimony. *See id.* We address each point below.

### 1.    Mr. Reyman is qualified to provide the proffered testimony.[7]

An expert must be qualified in the area of expertise for which he seeks to offer testimony through "knowledge, skill, experience, training, or education." Fed. R. Evid. 702(a). The government argued that Mr. Reyman's testimony only "relates . . . to potential injuries inflicted and not to the characteristics of the device thrown." ECF No. 61 at 5. The government submitted that "lacking in [Mr. Reyman's] background is any sort of medical training associated with an explosive's effect on a human body" and, therefore, "[n]o valid scientific connection exists between his experience and the opinions he offers." *Id.* at 6. The government appears to have misunderstood the nature and extent of Mr. Reyman's expertise and the proffered testimony. Indeed, contrary to the government's submission, Mr. Reyman is qualified to testify about a device's ability to inflict certain injuries and does not intend to submit testimony from a medical perspective.[8]

---

[7] If the government intends to suggest that Mr. Reyman's lack of a college or graduate degree makes him any less of an expert in his fields or familiar with the recommended procedures and methodologies in his fields, the government's suggestion would not be supported by fact or law. *See, e.g.*, *United States v. Channon*, No. CR 13-966 JCH, 2015 WL 13666980, at *8 (D.N.M. Jan. 8, 2015) (explaining that the party's speculation that the other party's expert may lack familiarity with recommended procedures and methods that could otherwise be demonstrated by advanced certifications is merely a suggestion that the expert had a gap in his qualifications or knowledge, which would ultimately go to the weight of the testimony, not the admissibility).

[8] In sum, Mr. Reyman is concluding, based on a certain device, a certain injury is possible (and vice versa). He is also using his specialized knowledge as an expert to explain that the image he viewed of the pants, for example, does not depict a burn but instead metallic oxide or plaster residue common after the functioning of a novelty device or legal firecracker. Such a conclusion is permissible via observation with the naked eye. *See, e.g.*, NFPA 921, § 24.7.1 (providing that physical evidence may extend beyond the body itself and that such evidence may be visible to the naked eye, like with a blood stain, or may be microscopic, such as with a hair or fiber, and can be found on things like clothing; providing that all shrapnel evidence should be collected). All of this is par for the course based on his fields of expertise.

To be sure, relying on his expertise, Mr. Reyman is able to look to the type of injuries alleged to determine what type of device inflicted a respective injury, if any, and is able to look to the type of device to determine what type of injury was possible, if any.[9]  Relatedly, while Mr. Reyman's expertise is not limited to the manufacture of pyrotechnics and explosives, such expertise would still be sufficient to afford him the appropriate expertise to testify about possible injuries, either as a means to determine the device or to determine whether injuries were possible based on objective information about the device.

As provided in the defense expert disclosure, Mr. Reyman has 36 years of experience as an expert in pyrotechnics, explosives, and fireworks and 16 years of experience as a civilian bomb technician. Mr. Reyman's expertise certainly extends beyond the one incident many, many years ago where a firecracker went off in his hand. Indeed, Mr. Reyman's proffered testimony (and ability to offer the proffered testimony) is based on his many years of experience as an explosives manufacturer, his many years of experience as a bomb technician, and his many years of engaging in trainings, courses, and independent research on relevant topics such as the effects of consumer fireworks, including as it relates to his work as a manufacturer and bomb technician. Whether in a formal or informal capacity, Mr. Reyman has consulted law enforcement in approximately 30

---

[9] Some standards for fireworks and/or explosives experts actually discuss injuries possible based on a certain effect. As one example, the materials provided in NFPA 921, §§ 24.2.10.1 through 24.4.1, describe how different explosive explosion effects can result in different injuries (if living) or damage to the body (if postmortem) and how they can be prevented. For example, the portion on thermal injuries explains that the fewest injuries from explosions are third degree, which can be fatal, and that, often a thin layer of clothing can protect the underlying skin from injury from sustaining burns. *See id.* Ultimately, the NFPA 921 and similar standards expect experts in explosives and fireworks to be knowledgeable in the harms that are possible based on a device's effects. *See id.* (providing, *inter alia*, that, oftentimes, burn injuries are localized to the side of the body facing the expanding flame front and this finding can be used by the investigator as a heat and flame or explosion dynamics vector); *see also* NFPA 921 § 24.8 (providing for the post scene investigation of injuries); *id.* at § 24.8.1 (providing that evidence of burn injuries is often recorded in medical reports using terms with which the investigator should be familiar); *id.* at § 24.6.4 (providing that the investigator should make special efforts to gather information related to the type of treatment that the injured person received).

cases.[10] Members of the ATF and other law enforcement entities have continued to return to Mr.

Reyman as a resource because of his expertise in fireworks and pyrotechnics. It is our

understanding that it is not common for law enforcement, even bomb technicians or other forms

of explosives experts, to obtain training as it relates to pyrotechnics and (especially) fireworks. In

seeing this information gap, Mr. Reyman has dedicated his time to provide trainings, including the

main training course that he provides that pertains to demonstrating injuries and destruction

possible as a result of certain chemical compositions or structural components used to make a

device. The main training course that Mr. Reyman provides is an approved course within the POST

program in Arizona, and, like the proffered testimony, is a culmination of what that Mr. Reyman

has learned as a manufacturer and bomb technician and/or through trainings, courses, aiding law

enforcement, researching this type of information (such as by experimenting with different

devices/compounds with law enforcement officers to see and understand the effects, reading

relevant, reputable expertise-specific or -adjacent publications, and reviewing other relevant,

reputable sources of information),[11] and discussing cases with other bomb technicians and

members of law enforcement. An example of what a demonstration in Mr. Reyman's

aforementioned course might entail includes Mr. Reyman igniting fireworks to show the power of

such devices (such as where Mr. Reyman places fireworks and a particular mechanism to show

the damage that could be caused to that particular mechanism). Mr. Reyman's goal for the

---

[10] In addition to his formal consultations as an expert on cases, Mr. Reyman provides informal consultations to law enforcement who inquire about scenes involving explosives or fireworks in order to ensure the scene is processed safely and that correct determinations are made.

[11] For instance, as a function of his own interest and his role as a manufacturer, among other things, Mr. Reyman educated himself in innerworkings (e.g., the publications, the regulations) of the Consumer Product Safety Commission, which regulates what can go into a consumer firework (e.g., chemicals, quantity) in order for them to be safe for use (and, of course, misuse) by the general public. The CPSC warns, for example, that "[s]parklers burn at temperatures of about 2,000 degrees Fahrenheit—hot enough to melt some metals." Fireworks, CPSC, https://www.cpsc.gov/Safety-Education/Safety-Education-Centers/Fireworks.

aforementioned course is to help people understand how to approach an environment or situation without getting hurt or killed.

As a result of Mr. Reyman's expertise, Mr. Reyman knows that some items cannot create enough heat to burn people (and that some can) and that it depends on what compounds are used to construct a device and how it is constructed. He knows, for instance, that a legal firecracker does not produce enough heat to burn someone. *See also* NFPA 921, §§ 24.2.10.1 through 24.4.1 (explaining how a thin layer of clothing can often protect the underlying skin from sustaining burns from an explosion.).

How or whether a device can penetrate clothing or gear depends on the clothing or gear at issue. He does not intend to make a sweeping statement about what the gear is made of, but he indicates that, based on what he has learned through his expertise (such as through discussing with law enforcement officers), he understands what the standard is for law enforcement uniforms (e.g., at least flame-resistant clothing). And, again, Mr. Reyman understands the effects a respective device can have and how something as simple as clothing covering the skin can prevent harm, if any is possible. *See id.* In any event, we have an expert lined up who can provide thorough testimony on law enforcement gear and clothing, if needed.[12] (If the Court determines that Mr. Reyman cannot testify generally on the issue of protective equipment and uniforms based on the defense's expert disclosure and briefings, Mr. Reyman would be permitted to rely on the testimony of the expert in law enforcement gear/clothing pursuant to FRE 703.)

The government seemingly acknowledged that Mr. Reyman has the appropriate expertise to opine and/or offer expert testimony on the type of device thrown. *See id.* at ECF No. 61 at 7. By virtue of its acknowledgement, the government undermines (and, arguably, defeats) its own

---

[12] As an aside, in the forthcoming motion to compel, we will be seeking specific materials related to the actual gear worn and used.

argument. Indeed, Mr. Reyman's expertise, even as narrowly articulated by the government, inherently requires specialized knowledge in the types of protective gear and procedures recommended for a respective device, the harm that can be inflicted to the human body as a result of proper functioning or malfunctioning of a respective device, and the effects (including heat and sound effects) that are possible from a respective device's proper functioning or malfunctioning. When adding, *inter alia*, his expertise in pyrotechnics and fireworks (as it relates to manufacturing or otherwise) as well as his experience as a bomb technician into the picture, it is apparent that Mr. Reyman is more than qualified to offer expert testimony on possible injuries based on his expertise (i.e., not from a medical point of view). And, such a position finds support in the fact that courts routinely allow individuals with similar backgrounds to Mr. Reyman to provide such testimony.

### i.    *Manufacturer of Explosives, Pyrotechnics, and Fireworks*

Mr. Reyman has first-hand experience with and training in the effects and potential harm that can result from the manufacture and functioning of a wide range of devices.[13] In fact, it is part of his day-to-day job to understand what harms come with certain devices. *See* "Disaster Preparedness for Federal Explosives Licensees and Permittees," ATF, https://www.atf.gov/file/58706/download (advising individuals to contact the manufacture in order to determine the appropriate means to destroy an explosive device). As a manufacturer of explosives, pyrotechnics, and fireworks, one has a nuanced understanding of what devices exist, what component parts exist, and the specific effects and harms associated with or that could possibly result from a respective device and/or component part.

---

[13]    *See, e.g.,* Contract re February 14, 2012: http://pvaz.granicus.com/MetaViewer.php?view_id=5&clip_id=751&meta_id=33551.

Activities such as creating and putting on fireworks displays is a big undertaking, where safety considerations are at the forefront of all operations. *See* Larry Hendricks, "Fireworks contractor ready for bang-up Fourth," AZ Daily Sun (July 1, 2003), https://azdailysun.com/fireworks-contractor-ready-for-bang-up-fourth/article_01c08d9f-00ab-560f-9f8e-2e4606b15b66.html (quoting Mr. Reyman discussing safety considerations in putting on a fireworks display show). Accordingly, Mr. Reyman and his employees must be (and are) knowledgeable about the proper protective gear to wear, what protocol to take to prevent injury/harm when handling a device or when in the proximity of a device. *See, e.g.*, NFPA 1124, § 4.13.1 (providing that each plant shall designate an employee as safety officer who shall be responsible for general safety, fire prevention and protection, and employee safety training). Mr. Reyman trains all of his employees in the safe possession and use of explosive devices. *See, e.g.*, *id.*, § 4.13.2 (providing that the safety officer shall provide formal instruction to all employees upon their commencing employment and at least annually thereafter regarding safety methods procedures and requirements and procedures for handling explosive and pyrotechnic compositions end devices). Such training has allowed the members of his staff to be employee possessors with the ATF.

### ii.    *Bomb Technician*

Mr. Reyman's role as a bomb technician provides him with the appropriate expertise to provide the proffered testimony.

Bomb technicians such as Mr. Reyman have two main functions in this role. They are investigators (e.g., pre-blast, post-blast) and they locate and dispose of harmful materials. *See* FBI Agent Explains How Bombs Are Disposed Of, Wired (Oct. 23, 2029), https://www.youtube.com/watch?v=nW_P2ngKPws. They are able and encouraged to determine

the type of device at issue based on the type of injury caused,[14] the type of property damage caused, the makeup of the device, and/or other information. They are privy to the different protocols for making such determinations and on disposing of any potentially harmful physical materials (which, includes training on what law enforcement equipment is best suited). *See, e.g.*, Sacramento Police Department Bomb Squad Materials, https://www.cityofsacramento.gov/content/dam/portal/police/Transparency/policy/RMs/RM%20 532.16%20-%20Bomb%20Squad%20Manual.pdf.

### iii.    *Routinely Allowed by Courts*

Explosives experts—even those who lack medical expertise—are routinely permitted to testify as to the type of harm possible from a device's functioning, regardless of if the expert is speaking from a post-blast or pre-blast posture.[15] Being able to render such an opinion is part and

---

[14] "A Guide for Explosion and Bombing Scene Investigation," U.S. Dep't Justice (June 2000), https://www.ojp.gov/pdffiles1/nij/181869.pdf (providing that the investigator must "[d]ocument thoroughly victims' injuries and correlate victims' locations at the time of the incident with the seat(s) of the explosion(s)," "[i]nterview the medical examiner/coroner and hospital emergency personnel regarding fatalities and injuries," and "attempt to determine the locations of all victims and witnesses[, as the v]ictim and witness statements and information about their injuries may be essential to establishing the nature of the device and the circumstances of the incident").

[15] *See, e.g.*, *United States v. Johnson*, No. 15-CR-125 (KBJ), 2019 WL 3842082, at *3 (D.D.C. Aug. 15, 2019), *aff'd in part, remanded in part*, 4 F.4th 116 (D.C. Cir. 2021) (allowing expert testimony from an ATF Explosives Enforcement Specialist about the explosive and destructive capability of improvised explosive devices at issue in the case and of the explosive at issue in the case); *United States v. Harbarger*, 46 F.4th 287, 291 (5th Cir. 2022) ("The expert's opinion . . . consisted of his saying that the device would fragment on being ignited, and the eruption of two pennies and a plastic bottle cap, along with the bamboo, could destroy property."); *United States v. Mann*, 701 F.3d 274, 309 (8th Cir. 2012) (allowing an explosives expert to testify that an MK3A2 is designed to cause casualties; allowing a bomb technician to testify that the type of grenade used in the bombing is "almost guaranteed" to kill any individual within a closed-in area where it explodes); *United States v. Spoerke*, 568 F.3d 1236, 1243-44 (11th Cir. 2009) (allowing expert testimony from an explosives officer that the pipe bombs could not be legally manufactured or sold since they did not have an industrial, commercial, or social use, that the bombs were "weapons" because fragments of the bomb could be projected in all directions and seriously injure people in the area, and that the pipe bombs were "destructive devices" under federal law and could not be fireworks because the bombs were designed to project fragments; allowing other testimony from an expert in explosives and pyrotechnics that the devices were not bombs since they were not lethal, that the devices were not designed to produce a lethal blast or fragmentation and were like firecrackers (not weapons), and that a device like the defendant's would send sharp plastic fragments only a few inches or feet through the air, though he did not perform tests of his own); *United States v. Smith*, 502 F.3d 680, 685 (7th Cir. 2007) (permitting explosives expert to testify that the bomb in that case "was designed to maim and kill bystanders and to destroy property"); *United States v. Hammond*, 371 F.3d 776, 778 (11th Cir. 2004) (allowing expert testimony that the objective design of the device indicates that it was intended to be a weapon since that anyone in direct proximity of the explosion of this device could sustain serious injury or death); *United States v. McNeil*, 106 F. App'x 294, 298 (6th Cir. 2004) (explaining that a member of U.S. Army Bomb Squad was allowed to testify that,

parcel of having the relevant expertise to identify a device. To be sure, as part of the government expert's disclosure, the government provided a copy of the FBI's Approved Standards for Technical Testimony and Report Language for Explosives and Hazardous Devices Analysis, on which its expert intends to rely. The document provided that "[a]n examiner may report and/or state that the explosion of an [*sic*] device or explosive could cause damage to the surroundings, personal injury, or death," and cited an example of an appropriate conclusion to provide in a report based on the examiner's observations: "The explosion from an IED of this type could cause damage to surrounding objects, injury, or death to personnel in the vicinity." If the government's

based on the contents discharged from the bomb and the damage it caused, the bomb was, in fact, an explosive device and that it could have caused serious injury if it had exploded); *United States v. Holder*, 104 F.3d 350 (2d Cir. 1996) (noting that there was testimony by ATF explosives expert that the devices at issue "would cause property damage and would be capable of causing serious injury or death to persons in proximity of the explosion"); *United States v. Williams*, 877 F.2d 516, 518 (7th Cir. 1989) (allowing an expert to testify that the device at issue "consisted of potassium nitrate, sulfur, sugar, charcoal and coal, and that it would cause serious personal injury and probably start a fire"); *United States v. Markley*, 567 F.2d 523, 524-25 (1st Cir. 1977) (allowing testimony from an expert that, if the devices at issue "were fired in the open against the outside of a car or house it would only scorch the paint and that such devices would not produce a violent explosion or bursting and that they were not highly destructive devices"); *United States v. Morgan*, No. 24-CR-6-JDP, 2024 WL 3330876, at *10 (W.D. Wis. June 5, 2024), *report and rec. adopted*, No. 24-CR-6-JDP, 2024 WL 3327866 (W.D. Wis. July 8, 2024) (discussing how the FBI Scientific Response and Analysis Unit relied on acid thrower weapon videos to conclude that the videos depictions were consistent with the use of concentrated sulfuric acid, which can cause disfiguring skin injuries and blindness); *Zareck v. United States*, No. CR 09-168, 2023 WL 5938383, at *8 (W.D. Pa. Sept. 12, 2023), *appeal dismissed*, No. 23-3043, 2024 WL 2272410 (3d Cir. Mar. 1, 2024) (explaining how the bomb technicians advised officers that the device was improvised explosive device and that the powder "us[ed] in these types of devices is extremely vol[a]tile [and] dangerous"); *United States v. Teston*, No. CR 22-1400 JB, 2023 WL 7410546, at *4 (D.N.M. Nov. 9, 2023) (allowing expert testimony by the ATF "that the explosion of the modified canister found in Teston's truck would produce blast and thermal effects, and projectile fragmentation at high velocity, which would be capable of causing property damage, injury, and/or death to nearby persons"); *Duarte-Herrera v. Hutchings*, No. 215CV01843GMNDJA, 2022 WL 118914, at *3, 10 (D. Nev. Jan. 12, 2022), *cert. of appealability denied sub nom. Duarte-Herrera v. Williams*, No. 22-15089, 2022 WL 18782845 (9th Cir. Aug. 26, 2022), *cert. denied*, 143 S. Ct. 792, 215 L. Ed. 2d 56 (2023) (allowing expert testimony from an explosives specialist for the ATF that the pipe bomb was "extremely lethal" and that fragmentation from the explosion could have caused injuries within an approximate 300-foot radius from the explosive device; allowing testimony from what we understand is another explosives expert that he "would certainly consider that [Chali] . . . would be in the danger zone" of the bomb and that she was not injured because of "pure luck," the vehicle's roof "deflect[ing] frag[mentation] above her head," and her short stature); *Kircus v. United States*, No. 213CR00456RDPJHE, 2018 WL 6523180, at *4 (N.D. Ala. Dec. 12, 2018) (allowing expert testimony from ATF explosives enforcement officer that he considered the device to be an "improvised explosive weapon" due to its capability to fragment and injure persons standing nearby); *United States v. Polchan*, No. 08 CR 115, 2008 WL 11242850, at *2 (N.D. Ill. Aug. 5, 2008) (allowing ATF Explosives Enforcement Officer ("EEO") to testify that the debris recovered from the scene, including the presence of PVC fragments and perchlorate combustion products, was consistent with an improvised explosive weapon, commonly known as a "pipe bomb," in the absence of electrical components indicated that the device had been detonated through the use of a fuse, and the detonation of this device was capable of causing personal injury or death to persons near the explosion).

expert were to be permitted to provide such testimony based on his forensic expertise in improvised explosive devices and bombs,[16] certainly Mr. Reyman, who has extensive expertise in fireworks, pyrotechnics, and explosives and their possible dangers should be permitted to rebut the government when Mr. Reyman has concluded the device at issue in this case and the case comparison devices fall within his areas of expertise, including as it relates to the harm possible from such devices.[17]

## 2.    Mr. Reyman's proffered testimony is reliable.[18]

The government contended that Mr. Reyman's proffered testimony is not reliable. The government is mistaken.

A trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. . v. Carmichael*, 526 U.S. 137, 142, 152 (1999); *see id.* at 152 (providing that courts have broad discretion in determining whether an expert's testimony is reliable and how to test the reliability of an expert); "Judicial Perspectives on Daubert in D.C. and Virginia Federal Court," Federal Bar Association (Mar. 1, 2006), https://www.fedbar.org/northern-virginia-chapter//wp-content/uploads/sites/74/2019/10/2006-01-03-pdf.pdf at 4 [hereafter "Judicial Perspectives"]. *Daubert* set forth some of the factors a court may consider when making a reliability determination, which includes "[w]hether the theory or technique enjoys "'general acceptance'" within the relevant field. *Kumho Tire Co.*, 526 U.S. at 150 (citation omitted); *see id.* (explaining that the

---

[16] It is our recollection, however, that the government's expert did not offer an analysis or opinion as to injuries and/or possible harm other than simply stating: "However, explosive devices of this type are capable of inflicting damage to surrounding property as well as seriously injuring persons in the vicinity of the resultant explosion." Exhibit D.

[17] *See also Heller v. D.C.,* 952 F. Supp. 2d 133, 140 (D.D.C. 2013) (citations omitted) (providing that courts have recognized that "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate" and that "[r]ejection of an expert's testimony is the exception rather than the rule").

[18] It is our understanding that Mr. Reyman has never been notified that he was incorrect in rendering a determination about the device and/or its components when assisting law enforcement.

reliability concerns will depend on the type of expert testimony); *id.* at 142 ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.").

Mr. Reyman's methodology is one recognized by members of the relevant discipline(s). Various courts have provided guidance on what methodologies are appropriate for purposes of the proffered testimony. *See, e.g.*, *Heller*, 952 F. Supp. 2d at 141 (allowing expert testimony where expert analyzed the information available to him depicting the device and event at issue and then applied known scientific principles and other specialized knowledge); *United States v. Nichols*, 169 F.3d 1255, 1261-62 (10th Cir. 1999) (allowing a forensic explosives expert to give opinions about the type and size of the bomb that destroyed the Murrah building where the expert reviewed photographs, videotapes, charts, plans, and physical evidence recovered from the Oklahoma City crime scene, including the "purported piece of a Ryder truck's wooden cargo bay . . . impregnated with ammonium nitrate" that was "[k]ey to her testimony"); *United States v. La Cock*, No. CR 00-552 JP, 2001 WL 37124683, at *2 (D.N.M. Nov. 14, 2001) (referencing the government's position that experts in the field of destructive devices use the following methodology to determine whether a device is a device within the meaning of Section 5845(f): "First, they look at the forensic chemist's report to determine if an explosive material has been identified in the device. Second, they examine the investigative reports to determine the circumstances surrounding the device, how and where it was found, and whether the defendant made any statement regarding the device. Third, an explosive enforcement officer uses the following criteria to make his determination as to whether the device is a destructive device as defined by the statute: (1) Does the device include a quantity of explosive material? (2) Is there some form of confinement? (3) Is there a means of initiation? (4) Was the device designed as a weapon?"); *id.* (providing that the government

represented that the aforementioned "methodology and criteria is used by all [ATF] Explosive Enforcement Officers, that it has been in use since the ATF Explosives Technology Branch (ETB) was established in the mid-1970s, and that it has been used in thousands of cases"); *Brown*, 415 F.3d at 1267-68 (finding that a trial court did not err in allowing experts to testify based on "visual comparisons . . . combined with expert knowledge"); *United States v. Zajac*, No. 2:06-CR-00811 CW, 2010 WL 3546782, at *6 (D. Utah Sept. 9, 2010) (permitting expert testimony where the expert assessed the physical components of the device and evaluated them in conjunction with laboratory reports to conclude the device was a destructive device). A sister court has recognized that an expert's years of experience (e.g., in law enforcement, as a civilian bomb technician) can serve as the requisite "reliable data and methods." *United States v. Sutton*, 642 F. Supp. 3d 57, 73 (D.D.C. 2022), *on recon. in part*, No. CR 21-0598 (PLF), 2022 WL 17572835 (D.D.C. Dec. 7, 2022). *See also Elosu v. Middlefork Ranch*, No. 21-35309 (9th Cir. Feb. 23, 2022) (citations omitted) (explaining that the "fact that [the expert, who was a fire investigator,] relied on circumstantial evidence and inferences [in his testimony] is neither unusual nor unexpected, as fires routinely destroy all evidence of their origins," that "[b]y the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony," and that "fire investigation, no less than medicine, requires sound judgment in the face of uncertainty" and requires experts in the field to "use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties").

     Additionally, there are standards

     fireworks and pyrotechnics experts often refer to NFPA 1123 and 1124. Explosives and fire investigators rely heavily on NFPA 921.[19]

---

[19] Courts have also cited NFPA 921 affirmatively. *See Elosu v. Middlefork Ranch*, No. 21-35309 (9th Cir.) (citing cases) (providing that the expert reached his conclusions by applying NFPA 921, "which has been consistently

Mr. Reyman applied his methodology in a reliable manner for purposes of the relevant discipline(s). In fact, he engaged in the same rigorous analysis consistent with the same rigorous standards used by other relevant defense experts, *see, e.g.*, ECF No. 68 through 68-4; he also engaged in a more rigorous but similar analysis to the government's expert, *see* Exhibit D.

Mr. Reyman's application of methodologies recognized by courts in similar cases was reliable. While discussed throughout, some examples include as follows. As one example, as in *Nichols*, Mr. Reyman seeks to give opinions about the type and size of the device at issue using the methodology of reviewing photographs, videos, physical evidence, and reports of harm. As another example, as in *La Cock* (and as standard per ATF Explosive Enforcement Officer procedures), Mr. Reyman determined whether the device at issue is a destructive device under Section 5845(f) by "[looking] at the forensic chemist's report to determine if an explosive material has been identified in [a suspected] device," "examin[ing] the investigative reports to determine the circumstances surrounding the device [at issue], how and where [a suspected device] was found, and whether the defendant made any statement regarding the device [at issue]," and then looking at the destructive device criteria as provided by statute (i.e., does the device include a quantity of explosive material, is there some form of confinement, is there a means of initiation, and was the device designed as a weapon). *Compare* Reyman Report in ECF No. 68 through 68-4[20, 21] (explaining how the device did not have any design elements of a destructive device or a

---

accepted as a suitable foundation for fire investigation testimony"); *Schlesinger v. United States*, 898 F. Supp. 2d 489, 504 (E.D.N.Y. 2012) (collecting cases in which NFPA was employed); *McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 653 (D. Kan. 2003) (calling NFPA 921 "gold standard" for fire investigations).

[20] Mr. Reyman performed an analysis where he sought to determine not only if he was correct but to see if another theory, such as the government's, could be correct. *See* Reyman Report in ECF No. 68 through 68-4.

[21] Of note, Mr. Reyman's analysis offers the Court an understanding of why Mr. Ball's device is a firecracker or novelty device and is not a destructive device as the government's expert submits. *See* Reyman Report in ECF No. 68 through 68-4. His analysis walks through what is objectively observed in videos and otherwise in relation to the device's functioning, reported injuries, lack of fragmentation (as compared to the cardboard floating in the air after functioning, an image he relies on), etc. *See id.* Mr. Reyman indicated, among other things, that the residue is a smudge that is common following the functioning of a firecracker or novelty device. *See id.* By virtue of the device being a

device capable of causing serious injury because, among other things, it did not produce fragmentation; discussing how the devices effects might have been or at least appeared somewhat magnified because of the confined nature of the space, the structure of the space, and the reflection of light on the police shields against the backdrop of the dark tunnel; discussing how the deflagration was short-lived, which indicates it is not a powerful device) with *United States v. La Cock*, No. CR 00-552 JP, 2001 WL 37124683, at *2 (D.N.M. Nov. 14, 2001) (providing that a destructive device analysis where the forensic chemist's report indicated that the device contained Pyrodex explosive (a black powder substitute), described three initiator parts—two cardboard match striker pads constructed into an improvised tube, a bundle of three wooden-shafted matches wrapped together with copper wire, and a match-head end of the bundle encased in additional material consistent with crushed match heads, explained that the file box and its modified lid constituted the "confinement," and explained that the device was designed as a weapon because it was constructed as a booby trap, or to be victim-activated).

Moreover, Mr. Reyman's methodology is consistent with the standards set forth in NFPA 1123, NFPA 1124, and NFPA 921 and similar standards and he applies such reliably. In fact, his analysis was consistent with the FBI's own standards set forth, for example, in its Approved Standards for Technical Testimony and Report Language for Explosives and Hazardous Devices Analysis.[22] *See, e.g.*, Exhibit D (providing that identification of an item can be accomplished through visual observation and assessing attributes).

---

consumer good, it inherently falls outside the scope of what is captured by "destructive device." Such testimony addresses the contentions in the government's expert report while also negating the charge pertaining to an "explosive device" (since, as described below, firecrackers and similar devices are not on the Attorney General's list of explosive devices), arguably cuts against the "explosive" element for purposes of 844(h), discredits the government's witness, and shines light on the government's overzealous/careless/biased prosecution of Mr. Ball. The same can be said as it relates to Mr. Reymen's use of case comparisons to show what an actual harmful explosive device, like a destructive device, would look like.

[22] This standard is arguably less rigorous than what is provided in the NFPA and similar standards.

The only methodology that is helpful or necessary in this case given the lack of physical evidence collected from the scene[23] pertains to a review of videos, sound recordings, pictures (of the device and event at issue as well as images of a pair of pants purported to be burned by the device), and eyewitness accounts.[24] *See also Elosu v. Middlefork Ranch*, No. 21-35309 (9th Cir. Feb. 23, 2022) (citations omitted) (explaining that the "fact that [the expert, who was a fire investigator,] relied on circumstantial evidence and inferences [in his testimony] is neither unusual nor unexpected, as fires routinely destroy all evidence of their origins," that "[b]y the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence and expert testimony," and that "fire investigation, no less than medicine, requires sound judgment in the face of uncertainty" and requires experts in the field to "use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties"); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997) (noting that experts regularly "extrapolate from existing data").

Mr. Reyman's review of the event and device at issue was far more extensive than any conducted by the government's explosives expert; the government expert based his destructive device determination on a review of a handful of images and two videos that did not even contain sound. *See* Exhibit D. Thus, the government's position cannot be said to be sincere and should not be afforded merit. It is more than fair to say that Mr. Reyman's approach has general acceptance, given that every expert to consider the device at issue went through more or less the same motions

---

[23] It's our understanding that government has not been able to locate the purportedly burnt pants, for instance. Moreover, no evidence sweep of the scene was performed by the government. It is our recollection that the government also represented it does not possess images of the scene in the aftermath of the purported conduct to document the state of the tunnel. Though, it should be noted that, had there been more evidence to process beyond videos, images, and witness statements, Mr. Reyman would have been able to analyze it and conduct a chemical test of physical evidence.

[24] Dr. Steinberg acknowledges, for instance, that a non-expert would not readily notice the difference between an M-100 and an M-90, for instance.

in making the relevant determinations, with the government expert doing the least (and even failing to perform some steps).[25] Upon review of the videos and images depicting the device/event, the eyewitness statements, portions of Mr. Ball's custodial interrogations, laboratory reports, and otherwise, the defense experts consulted and/or retained by the defense also confirmed that the pants purported to be burned by the device at issue were not in fact burnt and, instead, displayed a smudge of residue consistent with residue that is commonly left over after the functioning of a firecracker and/or a novelty device.[26] *See* ECF No. 68 through 68-4; *see also Sutton*, 642 F. Supp. 3d at 73 (providing that an expert's years of experience can serve as the requisite "reliable data and methods").

As for the government's specific representation that Mr. Reyman's opinion that the device at issue is not on par with the devices in several other cases was based on the reported injuries of the officers, Mr. Reyman's conclusions are based on various considerations, including descriptions of the device and his own professional experience with, training on, or education about such devices, as his report and the defense disclosure provides. *See* Reyman Report in ECF No. 68 through 68-4; *see also Brown*, 415 F.3d at 1267-68 (permitting experts to testify based on "visual comparisons . . . combined with expert knowledge"). Indeed, as already explained, Mr. Reyman took a comprehensive and holistic approach.

The government also submits that Mr. Reyman's report does not explain how his technique has been tested or subjected to peer review. Mr. Reyman does not need to have his technique tested or subjected to peer review; it is not a requirement.[27] *See, e.g.*, McCormick, et al., at 670 (providing

---

[25] At one point, the government tested a device found at Mr. Ball's home but did so in a way where it had little to no evidentiary value since the expert stripped the device down to its internal part (removing the outer portion) and detonated it in a still position outside in a bright, sunny field.

[26] The defense experts (both consulted and retained) explained to defense counsel that testing was not necessary to make such a determination, as it was clear. In any event, the pants have not been made available to defense counsel and, from what defense counsel understands, there is uncertainty about locating them.

[27] Mr. Reyman's analysis and conclusions were made in collaboration with other experts that he consulted.

that *Daubert* directly rejects the notion that peer review and publication are required). But, in any event, Mr. Reyman's analysis and conclusions were not made in a vacuum. Other experts consulted by the defense agreed with Mr. Reyman's conclusions and process, as is clear from the defense's explosives expert disclosure.[28] *See* ECF No. 68 through 68-4; Exhibit C. Mr. Reyman also consults other experts in the field as needed outside the scope of the instant case. And, as it relates to the instant case, Mr. Reyman also compared other cases and devices with the case at issue to confirm his conclusions and addressed alternative theories. *Daubert*'s reliability requirement is meant to ensure rigorous efforts by individuals with appropriate specialized knowledge; Mr. Reyman and his proffered testimony certainly overcome the concerns underlying *Daubert*.

### 3.  Mr. Reyman's proffered testimony is helpful to the trier of fact.

To testify as an expert, a witness's scientific, technical, or other specialized knowledge must be of the sort that will help the trier of fact to understand the evidence or to determine a fact at issue. *See* Fed. R. Evid. 702(a). In making this determination, courts ask whether the proffered testimony is more likely than not to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* To aid their analysis, courts look to "whether the testimony is relevant, within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witness'[s] credibility." *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) (citations omitted).  A determination as to helpfulness "rests within the sound discretion of the trial court." *United States v. Buchanan*, 787 F.2d 477, 483 (10th Cir. 1986) (citing *United States v. Barton*, 731 F.2d 669, 672 (10th Cir. 1984)).

A single individual may testify as both an expert and a lay witness, depending on the nature of the specific testimony at hand in a given moment. "A person may testify as a lay witness only

---

[28] Additionally, as mentioned, the government's expert followed less steps.

if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *United States v. Romero*, No. 21-CR-00559-JCH, 2023 WL 2655631, at *4-5 (D.N.M. Mar. 26, 2023) (citing *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (brackets and citation omitted)). Indeed, "lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Id.* (citing *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (quoting Fed. R. Civ. P. 701 (Adv. Comm. Notes (2000 Amend.))). To be sure, "[w]hen a law enforcement officer testifies to knowledge derived from the investigation of the case at hand, it is typically considered lay testimony, but when the testimony is based on the officer's professional experience as a whole, it is expert testimony." *Id.* (citing *United States v. Draine*, 26 F.4th 1178, 1187 (10th Cir. 2022). When there is a sincere concern a jury might confuse whether testimony is lay or expert in a given moment, the proper remedy is for the Court to provide a limiting instruction, not to exclude the lay testimony outright.

Mr. Reyman knows what type of harm is possible from such devices and can identify a device and its possible effects (including harm) based on considerations such as what materials are used to make a device, how the device is structured, and the relevant manufacturing regulations (e.g., the required product testing for consumer grade devices, the limitations on the amount of powder or other materials that can be contained in a consumer grade device). Indeed, Mr. Reyman came to his conclusion by analyzing the information available to him depicting the device and event at issue and then applying known scientific principles and/or other specialized knowledge, which is a proper methodology. *See Heller*, 952 F. Supp. 2d at 141.

Mr. Reyman reviewed the materials depicting the device and event at issue (including eyewitness reports of the effects) and turned to his many, many years of experience, training,

courses, and specialized knowledge to render conclusions about the type of device—which inherently includes conclusions about the type of harm possible from such a device. Mr. Reyman's proffered testimony "explains something 'beyond the understanding and experience of an average citizen.'" *Jackson v. Catanzariti*, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (quoting *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). Indeed, Mr. Reyman's "specialized knowledge of" and "long experience with" fireworks and other devices go "well beyond that of an average person and . . . afford[] expert insights helpful to a jury in [even the task of] identifying objects in [videos and] images." *United States v. Felder*, 993 F.3d 57, 71-73 (2d Cir. 2021) (concluding that the opinion by a detective that an object visible in footage was a firearm was not a lay opinion because it was not based on events detective experienced first-hand, but rather, his specialized knowledge of and long experience with firearms and their component parts); *see Conn*, 297 F.3d at 554 (concluding that an agent's opinions that firearm were not collector's items was expert opinion because even a lay person familiar with firearms in general would not have that expertise to distinguish between collector's items firearms and non-collector firearms). For instance, part of Mr. Reyman's rebuttal analysis as to why the device at issue is not a destructive device includes his explanation that it is not designed to be used as a weapon, as evidenced by the lack of shrapnel, among other things.[29] *See United States v. Wright*, No. 4:19-

---

[29] A key question in this case is whether Mr. Ball's purported device is an "explosive," "deadly or dangerous weapon," and/or "explosive device" under the relevant statutes. With his expertise, Mr. Reyman is able to look to all of the circumstances and considerations and offer an opinion on the type of device at issue (i.e., a legal firecracker or novelty device, including some examples of possible specific devices) to explain its capabilities, etc., for the factfinder to have the underlying facts in order to render findings. For instance, with Mr. Reyman's expertise in the regulations governing fireworks, he will be able to explain that a firecracker is not listed as an explosive device for purposes of the Attorney General's annual list, which speaks directly to one of the pending charges, as already mentioned. Additionally, although not specifically charged, the government's destructive device determination arguably speaks directly to at least two of the charges—the Section 844(h) charge and the 111(a) and (b) charge—since it speaks to a device's qualification as an explosive and a device's capacity to inflict injury based on design, respectively. Mr. Reyman's analysis is, at base, more likely than not to help the factfinder understand the evidence decide a fact of consequence at issue.

CR-149, 2024 WL 1957316, at *7 (S.D. Ga. May 3, 2024) (citations omitted) ("Recognizing specific, technical characteristics of electronic components and identifying them as both significant and similar requires something beyond the understanding and experience of the average citizen.").  He also explains how the device at issue is different from others that have been used in other cases that would, unlike the device at issue here, be capable of injuring someone or causing property damage, which addresses the government expert's position that the device is capable of causing injury or death, *see* Exhibit D. When there were multiple devices that functioned within the tunnel or otherwise on January 6 and the government conceded that at least one eyewitness who claimed severe injury confused the device at issue with another device, Mr. Reyman's analysis and conclusions as to the device and its capabilities, among others, are of the utmost significance and offer information that only an expert can provide. *See id.* (citations omitted) ("Recognizing specific, technical characteristics of electronic components and identifying them as both significant and similar requires something beyond the understanding and experience of the average citizen."); *see also United States v. Nichols*, 169 F.3d 1255, 1266 (10th Cir. 1999) (explaining that, because the government sought to prove the defendant conspired to use a weapon of mass destruction, although the expert "could not determine all of the components of the bomb, her statement that the damage was consistent with certain types of devices and inconsistent with others was plainly relevant" and "[h]er description of the composition of the bomb and its possible detonation device tended 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [testimony]'" since the expert testified that the bomb was consistent with the materials found in the possession of the defendant).

While we do not believe any portion of Mr. Reyman's testimony should be considered lay testimony, should the Court find otherwise and, if the Court deems it appropriate, we would not object to the Court providing a limiting instruction to help the jury consider such testimony appropriately.

### 4. The government's requested relief is not an appropriate remedy.

While the Court should not exclude any of Mr. Reyman's proffered testimony, it would not be a logical or equitable remedy to grant the government's request to exclude all of Mr. Reyman's proffered testimony when the government takes issue with only a narrow portion/aspect of it (i.e., the portion addressing potential injury in Mr. Ball's case). Though we submit that Mr. Reyman's proffered testimony should be admitted in its entirety, based on the government's narrow concern, any relief should be equally as narrow (such as providing an instruction to the jury that, for instance, the testimony is non-medical, or excluding only the testimony about possible injury in Mr. Ball's case).

In summary, Mr. Reyman, who has years and years of training and experience with fireworks and other relevant devices, offers opinions and analyses that help the factfinder(s) understand the device at issue and whether and/or what type of harm could have resulted from Mr. Ball's purported use of the device, including the possible effects (and therefore harm) of such a device.

## II.    JOHN STEINBERG[30, 31]

To be admissible, an expert's testimony must be helpful to the trier of fact. *See* Fed. R. Evid. 702. In making this determination, courts ask whether the proffered testimony is more likely than not to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Such a determination "rests within the sound discretion of the trial court." *Buchanan*, 787 F.2d at 483 (citing *United States v. Barton*, 731 F.2d 669, 672 (10th Cir. 1984)).

The government contends that Dr. Steinberg's proffers testimony on "the severity of the charging decision" and "his conclusions of the law that is applicable" and argues that such testimony, as mere conclusions of law, falls outside FRE 702 since it is not helpful to the trier of fact. The government appears to be confused as to the nature of Mr. Steinberg's intended testimony on these topics and further appears to not be apprised of the current state of the law.

Federal Rule of Criminal Procedure 704 abolished the "ultimate issue" objection; indeed, the rule specifically provides that an expert's opinion is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact. *See also Iacangelo v. Georgetown Univ.*, 560 F. Supp. 2d 53, 54 (D.D.C. 2008), *adhered to,* No. CIV.A. 05-2086 PLF, 2010 WL 4807082 (D.D.C. Nov. 19, 2010) ("Federal Rule of Evidence 704 generally allows 'testimony in the form of an opinion or inference otherwise admissible' even where it 'embraces an ultimate issue to be decided by the trier of fact.'").

---

[30] To address the government's confusion about how the regulatory and statutory frameworks inform technical expertise and vice versa, we have submitted an updated report with such reference. *See* ECF No. 68 and attachments.
[31] At this time, we do not oppose the government's request that <u>trial</u> testimony not include conclusions about application of the Sentencing Guidelines but ask to be able to reevaluate based on any relevant issues that might arise in the event such testimony would not be put on at trial. We would, of course, insist that the defense experts be able to offer testimony or otherwise on the full scope of issues at play in the event Mr. Ball is sentenced in this case or for purpose of motions practice. But we do not read the government to be asking to exclude any of the testimony herein except in the context of trial. If we are mistaken, we would ask that we be permitted to file a supplement or surreply.

Courts have held that expert testimony on whether a device is an explosive bomb, destructive device, explosive, etc., is an ultimate question of fact rather than merely law and is therefore permissible. *See Markley*, 567 F.2d at 525; *United States v. Markey*, No. CR 03-778 MCA, 9 (D.N.M. Dec. 5, 2003) (citation omitted); *see also id.* at 11-12 (permitting the parties to refer to the statutory definition of "explosives" in 18 U.S.C. § 841(d), which includes the phrase "the primary or common purpose of which is to function by explosion"); *United States v. Smith*, 502 F.3d 680, 685 (7th Cir. 2007) (permitting explosives expert to testify that the bomb in that case "was designed to maim and kill bystanders and to destroy property"); *United States v. Hammond*, 371 F.3d 776, 778 (11th Cir. 2004) (allowing expert opinion that the objective design of the device indicates that it was intended to be a weapon); *Buchanan*, 787 F.2d at 483 (citing *United States v. Homa*, 608 F.2d 407, 409 (10th Cir. 1979) ("Whether the nature of a particular device is such that it must be registered is an ultimate fact question.").

Moreover, courts have recognized that "merely because an expert proposes to testify about a statutory element does not mean his . . . testimony must be precluded." *United States v. Zajac*, No. 2:06-CR-00811 CW, 2010 WL 3546782, at *4-5 (D. Utah Sept. 9, 2010) (citing cases); *see also id.* at *6 (D. Utah Sept. 9, 2010) (allowing an ATF expert to testify that a device was a destructive device and that it was "the type of device that had to be registered with ATF").

In highly technical cases like the instant case, it is routine, or commonplace, for courts to allow experts to assist the factfinder by offering conclusions that embrace ultimate issues so long as the conclusions are supported by an explanation as to how the expert so concluded, because such testimony is inherently helpful to the trier of fact. *See Ellis v. Hobbs Police Dep't*, 472 F. Supp. 3d 1087, 1092-93 (D.N.M. 2020) (citing *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015)) ("Permissible testimony provides the jury ith the tools to evaluate an expert's ultimate

conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field."); *see also Lins v. United States*, No. CV ELH-17-2163, 2024 WL 1604494, at *20 (D. Md. Apr. 12, 2024) (*United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (stating that "in complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts"), *cert. denied*, 502 U.S. 83 (1991)). Accordingly, "[w]itnesses are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions." *Bishop*, 926 F.3d at 632 (citing *United States v. Richter*, 796 F.3d 1173, 1196 (10th Cir. 2015)); *see id.* (citation omitted) (explaining that, "as long as [the expert] explained the basis for his opinion, it was not improper for him to testify that the TCGTR was a machinegun"); *id.* (citing *United States v. Buchanan*, 787 F.2d 477, 483-84 (10th Cir. 1986) (holding that an expert witness may testify that "a particular device . . . must be registered" as a firearm with ATF)). In other words, when expert testimony goes directly to the application of governing law to the facts, it is admissible if the issue presents technicalities that expertise illuminates. *See* McCormick, et al.,;. *Buchanan*, 787 F.2d at 484 (citations omitted) ("The question before the jury involved the consideration of a particular homemade device against an array of statutory definitions. Under such circumstances, the courts have admitted this sort of testimony.").; *see also Lins v. United States*, No. CV ELH-17-2163, 2024 WL 1604494, at *20 (D. Md. Apr. 12, 2024) (quoting *United State v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)) ("Of relevance, "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative.")). Indeed, the discussion of the statutory definitions and the statutes' text is part and parcel to rendering expert testimony, *see United States v. Carroll*, 518 F.2d 187, 188 (6th Cir. 1975) (admitting expert testimony "that Seconal is a

barbituric acid which is controlled under Schedule III"); *United States v. Fogg*, 652 F.2d 551, 556-57 (5th Cir. 1981), *cert. denied*, 456 U.S. 905 (1982) (admitting expert testimony that certain expenses are deductible under the federal tax laws), particularly in a case like this, with its many technical complexities and because of the statutes at play.  When, as here, the government must prove beyond a reasonable doubt that a device at issue falls into one of the respective definitions (e.g., "explosive," "explosive device," "deadly or dangerous weapon"), such the proffered testimony is certainly helpful. *See Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 200 (D.D.C. 2015), *aff'd on other grounds sub nom.Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57 (D.C. Cir. 2016) (citing *Kapche v. Holder,* 677 F.3d 454, 464 (D.C. Cir.2012) ("But it is clear beyond cavil that an expert may give 'his "opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied[.]"'").

 As Dr. Steinberg explains in ECF No. 68 through 68-4, his conclusions as to terms defined by statute are a symptom of the fact that the statutes utilize technical terms in his field(s) of expertise, and that the there are various regulatory and/or statutory frameworks at play, some of which rely on each other. For instance, an expert would need to explain how the definition of explosive for purposes of 18 U.S.C. § 841(d) specifically references the annual list of explosives compiled by the Director of the ATF and published in the Federal Register by the Attorney General. *See id.* Further, keeping with that example, Dr. Steinberg will explain that, although items that might be used to make a firecracker might be listed on the annual list, based on how the list works, a completed firecracker is not an explosive for purposes of the statute. *See also*, *e.g.*, "Fireworks," ATF, https://www.atf.gov/explosives/fireworks (discussing how completed consumer fireworks are regulated as fireworks and not explosives by the DOT; discussing how the ATF does not regulate completed consumer fireworks).

As explained for purposes of Mr. Reyman's testimony, the destructive device determination and similar determinations are directly relevant here. For instance, Dr. Steinberg's respective proffered testimony responds to the government expert's conclusions that the device at issue is an explosive device and a destructive device. *See* Exhibit D. The government's expert effectively relies on the statutory language to render an opinion. Dr. Steinberg should not be precluded from rendering rebutting testimony. The government's expert specifically concluded that the device at issue is a "destructive device," referring to the language of the statute in its conclusion. *See, e.g.*, Exhibit D (concluding that, based on "the functional characteristics of the explosive device as depicted in Request 1, coupled with the application/use of the device as a weapon," the device is an "explosive device" that constitutes a "destructive device"). Dr. Steinberg offers a rebuttal to the government expert's analysis, explaining, among other things, that the analysis is incomplete since devices like consumer firecrackers are specifically excluded. *See* Steinberg Report in ECF No. 68 through 68-4. Mr. Ball should not be deprived of the opportunity to directly rebut the government expert's opinion and analysis. Such a depravation is not provided for the in the law or as a matter of equity.

The government submits that proposed conclusions related to comparisons to other cases or the applicable law and would not assist the trier of fact in determining an issue in dispute. It is quite common in explosives prosecutions for images, videos, and descriptions of other devices to be provided as a means for the fact finder to compare the device at issue in order to make an appropriate determination as to the device.[32] The government's position that Mr. Ball's purported device is a destructive device, *see* Exhibit D, invites the defense to present examples of what an actual destructive device looks like and how it functions (particularly since a relevant question is

---

[32] Within the last handful of years, for example, the government sought similar relief in the *Trabelsi* case.

whether it was designed as a weapon[33]). *See United States v. Reindeau*, 947 F.2d 32, 36 (2d Cir. 1991) ("[T]he defendants should have had the opportunity on cross-examination to challenge the expert's conclusion that the device was designed for any legitimate use. If the defense could have created an issue as to that determination, based on either the expert's investigation of the particular device in question or his experience with other investigations, the jury may have found reasonable doubt under the applicable law."). The fact that there is a pending question of whether the device at issue is a deadly or dangerous weapon also necessitates the use of such examples, because the fact finder will be able to understand how menial this device is when compared to actual deadly or dangerous weapons. Indeed, Dr. Steinberg concluded it is unlikely such devices could cause harm. *See* ECF No. 68 through 68-4.

Additionally, the case comparisons speak directly to the defense's theory that the government has engaged in selective prosecution, that the investigation and prosecution of Mr. Ball was deeply flawed, and/or that the device at issue does not meet the respective definitions in the statutes at issue. Consistent with D.C. Circuit precedent, Mr. Ball will submit evidence as to selective prosecution at trial so long as the Court permits.[34] The same is true as to evidence of the otherwise flawed investigation and prosecution of Mr. Ball.[35] Dr. Steinberg's testimony about the

---

[33] *See, e.g., United States v. Hammond*, 371 F.3d 776, 778 (11th Cir. 2004) ("Campbell, testified that, in his opinion, Hammond designed his device as a weapon. He based this opinion on the fact that the device was designed to explode, and that, upon explosion, '[a]nyone within direct proximity of this device could sustain serious injury or death.'").

[34] *See United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *United States v. Evans*, 216 F.3d 80, 85-86 (D.C. Cir. 2000) (citing *United States v. Washington*, 705 F.2d 489, 494-95 (D.C. Cir. 1983)) (explaining that selective prosecution may qualify as an issue of consequence in some proceedings, even a trial); *see also United States v. Jackson*, 849 F.3d 540, 556-57 (3d Cir. 2017) (holding that the use of co-conspirators' guilty pleas were permissible where the evidence regarding the guilty pleas "went to the heart of whether the co-conspirator witnesses were credible, whether the government selectively was prosecuting Jackson, and whether the co-conspirators had firsthand knowledge of the crime for which Jackson was being tried"); *see also* NFPA 921, s 12.2 (providing that investigators should be aware of constitutional considerations).

[35] *See Kyles v. Whitley*, 514 U.S. 419, 442 n. 13, 446 n. 15 (1995) ("When . . . the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it"); *United States v. Sager*, 227 F.3d 1138, 1145-46 (9th Cir. 2000) (concluding that the district court erred "in curtailing as irrelevant further

comparison cases provides a basis for the factfinder to understand what the device is (how it functions and what its effects are as compared to other devices) and the type of harm possible from the device at issue and further provide a basis to conclude that Mr. Ball has been selectively prosecuted here, that the investigation and prosecution of Mr. Ball was deeply flawed, and/or that the device at issue does not meet the respective definitions in the statutes at issue.[36, 37] To put it simply, such testimony requires something beyond the understanding and experience of the average citizen.

Moreover, Dr. Steinberg's proffered testimony that he does not consider a firecracker to be an "explosive" for purposes of Section 844(j) is entirely permissible, as he relies on his understanding of the technical frameworks of his expertise. He will explain how unusual and inconsistent of a result it would be for a firecracker to be considered an explosive in the context of Section 844(j) but not in any other legal context that underlies his technical expertise. Such testimony would be permissible. *See Bishop*, 926 F.3d at 633 (allowing the expert to testify about the factual basis for his opinion that the TCGTR is a machinegun, as defined in Section 5845(b); allowing testimony about why the expert considered the TCGTR to be a machinegun, as defined in Section 5845(b), when it was shipped to customers without any of the required bends); *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (internal quotation marks and alterations omitted) ("[A]n expert may refer to the law in expressing his or her opinion.").

Dr. Steinberg does not plan to instruct the factfinder as to what the law is that must be applied or reference case law to explain how courts have interpreted statutory definitions. Instead,

---

examination into the investigatory details, and . . . in informing the jury that it may not consider whether or not the investigation was flawed").
[36] Even if any such testimony is lay testimony, such testimony can be proffered by someone who is also providing expert testimony, as already explained.
[37] The same is true regarding the proffered testimony of Mr. Reyman.

as mentioned, he plans to discuss the technical terms in the context of the manner that he uses them within the scope of his expertise and to, when necessary (and if permitted), refer to the different provisions to help the jury understand the role of such terms within the larger statutory and regulatory frameworks in which he operates. *See, e.g.*, *United States v. Van Dyke*, 14 F.3d 415, 422 (8th Cir. 1994) (concluding that elaboration by the expert "would clearly have assisted the jury in understanding the regulation and defendant's reasons for asserting that he had not violated its provisions"). To put it simply, being able to distinguish between what "explosive" means in one context versus another is crucial since there are various frameworks at play for purposes of the expertise that are relevant in this case. The jury will not be able to properly understand or apply evidence as to an "explosive" or otherwise if the proffered testimony is not allowed.

The government submits that conclusions about the severity of the charging decision and of the law that is applicable is outside the scope of Rule 702. The government misunderstands Dr. Steinberg's conclusions about the applicable law and its propriety. As already explained, it is permissible for Dr. Steinberg to testify about the regulatory and statutory framework and their overlap; this information is fundamental to his and others' technical expertise. Moreover, as before, it is permissible for Dr. Steinberg to discuss—either as a lay witness or an expert[38]—trends in explosives prosecutions, how it is not the norm for the government to have charged Mr. Ball using the statutes at issue, and how there are factual deficiencies that make it impossible for the government to prove its case beyond a reasonable doubt.[39]

---

[38] It is our position that such testimony is expert testimony, however.

[39] For instance, the mere fact that the term firecracker is excluded from the annual explosives list automatically exonerates Mr. Ball. It is crucial for the jury to hear testimony from Dr. Steinberg's on, *inter alia*, how simply listing of a firecracker's component parts on the annual list does not therefore make the respective firecracker an explosive (instead, the term firecracker would have to be listed).

Dr. Steinberg's testimony about the technical framework that governs much of his expertise is crucial for the fact finder to understand how the imprecision and ambiguity of terms such as "explosive" under Section 844(h) make it hard to apply in practice, which undermines the government's menial analysis that the device at issue is an explosive, among other things. It further helps the factfinder understand the problem of where nonserious conduct is charged under this statute, which provides a heightened punishment and is meant to contemplate egregious offenses. Such testimony offers something "beyond the understanding and experience of the average citizen" helps the trier of fact and therefore should be admitted. *See, e.g.*, *United States v. Rouco*, 765 F.2d at 995.

Here, "[n]o issue [would be] removed from the jury." *United States v. Zajac*, No. 2:06-CR-00811 CW, 2010 WL 3546782, at *4-5 (D. Utah Sept. 9, 2010). The government is calling its own expert and will be able to cross-examine Dr. Steinberg to rebut any opinions offered, "which squarely places a jury in a decision-making mode of weighing credibility and resolving factual questions." *Id.*

Respectfully submitted,

_____/s/_____
Amy C. Collins
D.C. Bar No. 1708316
888 17th Street, NW, Suite 1200
Washington, D.C. 20006
(228) 424-0609
acollins@kalbianhagerty.com
amy@amyccollinslaw.com
*Counsel for Daniel Ball*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of January 2025, I caused a true and correct

copy of the foregoing Opposition to be delivered via CM/ECF to all parties.

_____/s/_____
Amy C. Collins